UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EMERSON ENTERPRISES, LLC,

                                        Plaintiff,          No. 03-CV-6530 CJS

        -vs-
                                                            DECISION AND ORDER

KENNETH CROSBY- NEW YORK, INC.,
KENNETH CROSBY CO., INC., T.T. BEARING
CO., INC., ROCHESTER TOOL CORP.,
JASCO TOOLS, INC., JAYNE C. SUMMERS,
CLARK WITBECK, INC., BRIAN J. CAIN,
BARBARA GOODRICH as Executor of the
Estate of VERNON GOODRICH, DEAN BRODIE,
CURTIS S. KLING, THE HARTFORD INSURANCE
CO., CONTINENTAL INSURANCE COMPANY,
GLENS FALLS INSURANCE CO., FIREMEN'S
INSURANCE COMPANY OF NEWARK, NJ,
THE TRAVELERS INDEMNITY CO., PG
INSURANCE CO. OF NEW YORK, JOHN DOE
CORPORATIONS, JOHN DOES, and
JOHN DOE INSURANCE COMPANIES,
                                        Defendants.

_____

APPEARANCES

For Plaintiff:                          Alan J. Knauf, Esq.
                                        Knauf Shaw, LLP
                                        975 Crossroads Building, 2 State Street
                                        Rochester, New York 14614
For defendant Hartford
Insurance Co.:                          Susan E. Quinn, Esq.
                                        Morrison & Foerster LLP
                                        1290 Avenue of the Americas
                                        New York, New York 10104-0050

INTRODUCTION

        This is an action pursuant to, *inter alia*, the Comprehensive Environmental

Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, the

1

New York Environmental Conservation Law ("ECL"), and New York Navigation Law. Now before the Court is defendant The Hartford Insurance Co.'s ("Hartford") motion [#195] for summary judgment on all claims being asserted against it in this action, including a declaration that it has no duty to defend or indemnify plaintiff.  The application is granted.

BACKGROUND

The underlying facts of this case were fully set forth in a previous Decision and Order [#165] of the Court.  For purposes of the subject motion, it is sufficient to note the following facts, which, unless otherwise indicated, are viewed in the light most favorable to plaintiff.  This action involves environmental contamination of a parcel of land, owned by Plaintiff, known as 640 Trolley Drive ("640 Trolley Drive," "the property," or "the site") in the Town of Gates, County of Monroe and State of New York.  Prior to 1960, the property was vacant land.  In or about 1960, a 12,300 square-foot masonry structure was constructed on 640 Trolley Drive, and since that time the various owners of the premises, including Plaintiff, have leased out the premises for industrial purposes. Defendant Clark Witbeck, Inc. ("Clark Witbeck") leased the property from the early 1960s until 1992.  Clark Witbeck's business involved distributing industrial tools and supplies, including abrasives, fasteners, cutting tools, and, most importantly for purposes of this action, liquid "cutting fluids" or "cooling fluids," containing polychlorinated biphenyls ("PCBs") and petroleum distillates.

On or about October 27, 2000, long after Clark Witbeck had vacated the premises, a subsequent tenant was clearing brush behind the building when it discovered a dry well, which contained a black, oily substance.  Subsequent testing

2

indicated that the material in the dry well contained PCBs,  1,1,1-trichloroethane ("TCA"), and other volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), acetone, and petroleum (including xylene and other petroleum constituents.).

Upon being notified of the contamination, the New York Department of Environmental Conservation ("NYDEC") listed the property on the state's Registry of Inactive Hazardous Waste Disposal Sites, and arranged for the dry well to be removed in January 2002.  The NYDEC also demanded that Plaintiff pay for the investigation and remediation of the contamination at the property.  More specifically, by letter dated August 28, 2001, the NYDEC informed Plaintiff of its intention to investigate and possibly seek costs to clean up the site.  For purposes of the instant motion, the parties agree that the NYDEC's letter is the "underlying complaint," against which Plaintiff seeks to have the defendant insurance companies provide a defense.  The NYDEC letter stated, in relevant part:

> As mandated by Section 27-1305 of the Environmental Conservation Law (ECL) . . . [the NYDEC] must investigate all inactive disposal sites suspected or known to contain hazardous wastes.  We have information which leads us to suspect that hazardous waste has been disposed of at the following location: 640 Trolley Boulevard
> ***
> This letter constitutes notification of the [NYDEC's] intention to investigate the validity of this suspicion.  Should this study confirm that hazardous waste disposal has occurred, this site will be entered into the New York State Registry of Inactive Hazardous Waste Disposal Sites.
> ***
> If the investigation reveals that hazardous waste disposal at a site poses a significant threat to the environment of public health, the Environmental Conservation Law provides the authority for the [NYDEC] to recover the costs for the investigation from the owners or others deemed to be responsible for the site.

As to this letter, the Court notes that the ECL defines "disposal" to mean,

> the abandonment, discharge, deposit, injection, dumping, spilling, leaking or placing of any substance so that such substance or any related constituent thereof may enter the environment. Disposal also means the thermal destruction of waste or hazardous waste and the burning of such wastes as fuel for the purpose of recovering useable energy.

NY ECL § 27-1301 (McKinney 2006).  The NYDEC subsequently arranged for the removal of the dry well in January 2002.  Moreover, the NYDEC  plans to conduct further investigation of the property, and, if necessary, further remedial work, and has demanded that plaintiff pay for such investigation and remediation.

Plaintiff commenced the subject action on October 29, 2003, seeking contribution and indemnification from the previous tenants of the property, and also seeking a declaratory judgment that various insurance companies, which had allegedly issued general liability policies to Clark Witbeck, were required to defend and indemnify plaintiff in the proceedings brought by the NYDEC.  In that regard, plaintiff claims that it is covered as an additional insured under any such policies issued to Clark Witbeck by Hartford.  Alternatively, plaintiff contends that, even if it is not an additional insured under such policies, it can recover cleanup costs from Clark Witbeck's insurers under N.Y. Navigation Law § 190.[1]

As for the nature of the alleged pollution on Plaintiff's property, Plaintiff's complaint contends that the contamination identified by the NYDEC "was caused by discharges and releases . . . including the dumping . . . of contaminants into a dry well .

---

[1]*See*, Amended Complaint [#100], 17th Cause of Action.  Navigation Law § 190 states: "Any claims for costs of cleanup and removal, civil penalties or damages by the state and any claim for damages by any injured person, may be brought directly against the bond, the insurer, or any other person providing evidence of financial responsibility."

. . located near the back door of the building on the property." (Complaint ¶ 2).  More

specifically, under the heading in the complaint entitled "DISCOVERY OF THE

CONTAMINATION," the complaint states that the subject contamination was

discovered in "a Dry Well, . . . just a few feet outside the back door of the Building,"

which the previous owners had concealed from plaintiff. (Id. ¶ ¶  64, 71).  Under the

heading in the complaint entitled "THE CAUSE OF THE CONTAMINATION," the

complaint states that the subject pollution occurred "[a]s the direct and proximate result

of the Dumping of Contaminants into the Dry Well." (*Id*. ¶ 72).  The complaint further

alleges that "[e]mployees of Clark Witbeck dumped contaminants in the dry well,

including PCBs, TCA and other VOCs, SVOCs, acetone, and petroleum (including

xylene or other petroleum constituents), throughout its occupation of the property, upon

information and belief beginning in the 1960s through 1992, or during part of that time."

(*Id*. ¶ 74).  Apart from these specific allegations of intentional dumping, the complaint

contains an allegation that, "[u]pon information and belief, some or all of the releases

occurred in a sudden and accidental manner." (*Id*. at ¶ 89).  However, the complaint

does not allege any particular sudden and accidental release, nor does it allege the

existence of any contamination besides that found in and around the dry well.

With regard to the pending motion for summary judgment, Hartford contends that

it is entitled to such judgment for two reasons: First, plaintiff cannot prove that Hartford

ever issued a general liability policy to Clark Witbeck, or, that if it did, that Plaintiff was

listed as an additional insured; and second, even if Hartford had insured Plaintiff,

coverage would be barred by the policy's pollution exclusion.  In opposition to the

motion, Plaintiff contends both that it can establish coverage by Hartford, and that

pollution on the property was caused by a sudden and accidental event.  As to its latter
contention, Plaintiff submits, *inter alia*, deposition testimony and affidavits from several
former employees of Clark Witbeck, as well as an affidavit from an environmental
scientist.  Basically, this evidence establishes the following facts: 1) In addition to the
dry well, there are two other contaminated sites on the property; 2) over at least two
decades, Clark Witbeck distributed "cutting fluids" or "cooling fluids," containing PCBs,
which it purchased in 5-gallon pails and 55-gallon steel drums; 3) over a period of
years, Clark Witbeck employees dumped drums of unneeded or discontinued cutting
fluid into the dry well;[2] 4) occasionally, the drums of cutting fluid, which were kept inside
the building, developed leaks, and employees would attempt to plug the leaks and/or
transfer the contents of the drum into a new drum; 5) approximately six 55-gallon drums
were discarded behind the building at some time during Clark Witbeck's tenancy; 6)
there was a "drainage swale" along the back of the building, leading from the dry well to
other parts of the property; and 7) on occasion, precipitation caused the contents of the
dry well to overflow and spread above the ground to other areas of the property.
Plaintiff concedes that the pollution at the dry well site would be excluded by the
pollution exclusion,[3] but maintains, based upon the foregoing information, that the
pollution at the other two sites would not be excluded, because it was sudden and
accidental.

The Court, having thoroughly considered the parties' written submissions and the

---

[2]Deposition of Ron Spinelli at 22, 25.

[3]As discussed further below, Plaintiff contends that pollution at the dry well site was accidental, but
not sudden.

arguments of counsel, now grants Hartford's application for summary judgment.

ANALYSIS

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*,

477 U.S. at 249.[4]   The parties may only carry their respective burdens by producing

evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts

contained in affidavits, attached exhibits, and depositions, must be viewed in the light

most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Summary judgment is appropriate only where, "after drawing all reasonable inferences

in favor of the party against whom summary judgment is sought, no reasonable trier of

fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d

Cir.1993).

The law of New York state concerning an insurer's duty to defend, when the

pollution exclusion is at issue, is similarly well settled:

> Once an insurer has satisfied its burden of establishing that the underlying complaint alleges damages attributable to the discharge or release of a pollutant into the environment, thereby satisfying the basic requirement for application of the pollution coverage exclusion provision, the burden shifts to the insured to demonstrate a reasonable interpretation of the underlying complaint potentially bringing the claims within the sudden and accidental discharge exception to exclusion of pollution coverage, or to show that extrinsic evidence exists that the discharge was in fact sudden and accidental.
>
> ***
>
> In determining whether the underlying complaint can be read as even potentially bringing the claim within the sudden and accidental exception to the exclusion of pollution coverage, a court should not attempt to impose the duty to defend on an insurer through a strained, implausible reading of the complaint that is linguistically conceivable but tortured and unreasonable.  Moreover, a court may look to judicial admissions in the insured's responsive pleadings in the underlying tort action or other formal submissions in the current or underlying litigation to confirm or clarify the nature of the underlying claims.

---

[4]It is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citations omitted).  Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987)(citations omitted).

*Northville Industries Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 89 N.Y.2d 621, 634, 679 N.E.2d 1044, 1048-1049, 657 N.Y.S.2d 564, 568 - 569 (1997) (citations and internal quotation marks omitted).

Here, the Court finds, first, that Hartford has met its burden under *Northville*. Further, although the foregoing legal principles indicate that Plaintiff can satisfy its burden either through the underlying complaint, or through extrinsic evidence, the Court finds that plaintiff cannot satisfy its obligation under *Northville* by relying upon the underlying NYDEC complaint.  As already mentioned, the underlying complaint alleges only that hazardous waste was "disposed of" at the subject property.  The term "disposal" includes "the abandonment, discharge, deposit, injection, dumping, spilling, leaking or placing of any substance so that such substance or any related constituent thereof may enter the environment," as well as the "thermal destruction of waste or hazardous waste and the burning of such wastes as fuel for the purpose of recovering useable energy." NY ECL § 27-1301.  This allegation of "disposal" does not suggest that the pollution was either sudden or accidental.  Even assuming that terms such as "spilling" and "leaking" suggested an "accidental" discharge, there is nothing within the complaint or statutory definition to suggest suddenness.  That is, the definition of "disposal" has no temporal component.  Consequently, while the underlying complaint could possibly encompass a sudden and accidental discharge, it does not suggest that the pollution at issue here actually was both sudden and accidental.  That being so, the underlying complaint cannot satisfy the insured's burden to show that the exception to the pollution exclusion applies; a contrary holding would essentially impose no burden

on the insured, which would be inconsistent with *Northville*.[5]

However, Plaintiff maintains that the underlying complaint need not affirmatively

suggest a sudden and accidental occurrence. (Pl. Memo [#221] p. 7) ("[W]here the

underlying complaint allege[s] the discharge of petroleum, but not the cause or

circumstances, there [is] a duty to defend.") (citing *Mahl*).  In an analogous situation,

though, arising under Connecticut law, the Second Circuit rejected that reasoning:

> Stamford urges us to adopt an alternative approach to construction of the
> "sudden and accidental" exception. Relying upon the reasoning of *New
> York v. Blank*, 27 F.3d 783, 791 (2d Cir.1994), which applied New York
> law, Stamford argues that the exception saves its coverage because the
> claims "do not rule out the possibility" that the contamination was caused
> by a sudden and accidental event. No doubt, one can conjure up a
> sudden and accidental event that is not absolutely incompatible with the
> set of allegations in any complaint. Here, it may be that a carter's truck
> suddenly overturned at the site and accidentally spilled its contents here
> instead of there, or that the pollutants suddenly and accidentally escaped
> from some containment basin or tank, and reached some of the polluted
> property by that route. And it may be that such a thing could be alleged;
> *but no allegation in the third-party complaint or the PRP letters gives one
> a reason to think that such a thing happened*. . . .  The pollution exclusion
> would lose all force if it could be defeated by the mere imagining of any
> sudden accident that is not actually foreclosed by the allegations of the
> underlying complaint.

*Stamford Wallpaper Co., Inc. v. TIG Ins.*, 138 F.3d 75, 81 (2d Cir. 1998) (emphasis

---

[5]*But see, Mahl Bros. Oil Co., Inc. v. St. Paul Fire & Marine Ins. Co.*, 307 F.Supp.2d 474 (W.D.N.Y. 2004), in which the district court held that a complaint which was ambiguous, but which did not *rule out* a sudden and accidental event, satisfied the first prong of *Northville*. *Id.* at 496 ("[I]n the instant case . . . the complaint filed in the underlying action . . . merely alleges that "[o]n or before November 2, 1993, a discharge of petroleum product contaminated the groundwater and soil . . . .  As such, the complaint in the underlying action alleges a discharge that is within the sudden and accidental exception to the pollution exclusion . . . .").  However, as Continental's counsel points out, this aspect of the *Mahl* decision was based on cases that predated *Northville*, and would appear to shift the burden back onto the insurer. (Continental Memo [#219-1] p. 8, 11) ("If an underlying complaint that did not characterize the discharge [as sudden and accidental] was sufficient, standing alone, to create the possibility of sudden and accidental releases, that would in effect reallocate the burdens identified in *Northville*; it would mean, in effect, that the insurer would have the burden of negating the possibility of a sudden and accidental release.").

added) (applying Connecticut law).  By the same logic, the Court finds that the NYDEC

complaint fails to satisfy the first method of establishing an insured's burden under

*Northville,* since it does not affirmatively suggest a sudden and accidental occurrence.

Consequently, the Court must determine whether Plaintiff has come forward with

extrinsic evidence that the subject discharge of pollution was both sudden and

accidental.  The Court finds that Plaintiff has not done so.

At the outset, it is clear that Plaintiff cannot rely upon extrinsic evidence of

pollution having to do with the dry well site, since such contamination was neither

sudden nor accidental.  While agreeing that coverage for pollution in and around the dry

well is excluded, because it was not "sudden," Plaintiff suggests, nevertheless, that

contamination at other points on the property, caused by overflow from the dry well,

was unintentional, and therefore "accidental."  According to Plaintiff, "the dry well was

perceived as a final resting place for the waste, and the dumpers did not intend

widespread pollution across the property.  Otherwise, there would have been no need

to use the dry well, and waste could have been scattered across the property."

(Plaintiff's Memo of Law [#241] at 8).  In short, Plaintiff argues that the dry well is akin to

a sealed storage tank that leaked unexpectedly.  Additionally, Plaintiff contends that

contamination caused by the spread of contaminants from the dry well was sudden,

because the overflow of the dry well may have been caused by a sudden event such as

a rainstorm.

The Court rejects this argument.  To begin with, it remains undisputed that Clark

Witbeck employees intentionally dumped pollutants into the dry well.  Although Plaintiff

suggests that any escape of pollutants from the dry well was accidental, because Clark

Witbeck " perceived" the dry well "as a final resting place for the waste," this contention

lacks merit because it fundamentally misunderstands the nature of a dry well.  A dry

well, by definition, is a device used to disperse liquid into the earth. *See, e.g.*, MERRIAM-

WEBSTER ONLINE DICTIONARY[6] (Defining a dry well as "a hole in the ground filled with

gravel or rubble to receive drainage water *and allow it to percolate away*.") (emphasis

added); *see also*, INFOPLEASE ONLINE DICTIONARY[7] (Defining a dry well as "1. a drainage

pit line with loose stonework *for the leaching of liquid wastes*. 2. See absorbing well.")

(emphasis added).  In other words, a dry well is the very opposite of a sealed storage

container, which fact is not diminished merely because some of the pollutant remained

in the pit at the time of its discovery.[8]  Consequently, because the activity resulting in

the pollution was intentional, the subsequent spread of the pollutants, due to the

overflowing of the dry well, cannot be deemed accidental. *Ogden Corp. v. Travelers

Indem. Co.*, 924 F.2d 39, 42 (2d Cir. 1991) ("Under New York law, the contamination of

a site is accidental when *the conduct, the activity resulting in pollution*, was unintended.)

(Emphasis added; citations omited).

Further, the spread of contaminants from the dry well site could not have been

sudden.  According to the undisputed testimony of Ron Spinelli, for example, the area

---

[6]http://www.merriam-webster.com/dictionary/drywell

[7]http://www.infoplease.com/ipd/A0417480.html

[8]Plaintiff contends, via the affidavit of its expert, S. Bruce Kohrn, that the dry well was "constructed
of brick and concrete blocks" and "had a clay bottom." (Kohrn Affidavit at ¶ 36) The factual basis for this
statement is unclear.  Even if the description of the construction of the dry well was true, however, there is
no indication that the walls of the dry well were water tight.  To the contrary, the design of a dry well is
ordinarily just the opposite.  Moreover, it is undisputed that the dry well was basically an open, uncovered
pit.

near the dry well was often flooded. (Spinelli Deposition at 23) ("[T]here was always a problem when it got wet back there, because this stuff would come to the top.  It would – actually, the well must have been filled and when it rained a lot it would come to the top."); (*see also, Id*. at 32) ("[W]hen it rained a lot, maybe in the springtime, it would come – it would come up and it would sort of like be foaming on the top surface around there.  Of course they couldn't do any kind of dumping or anything because it was just so much water back there . . . . [Y]ou couldn't even walk back there it was so wet."). Thus, the spread of contaminants from the open dry well, due to flooding, would have occurred over many years.

Alternatively, Plaintiff suggests that some of the contamination was caused by leaking drums of cutting fluid, which were placed behind the building.  However, as Defendant correctly points out, there is no evidentiary proof in admissible form that leaking drums of cutting fluid were taken outside the building.  Instead, there is only the testimony of Monty Alberts, a former Clark Witbeck employee, which is based on hearsay from an unidentified source. (Alberts Deposition at 24) ("[I]t was kind of brought to our attention that at a time they called that area 'the pit.'  And if they had a leaking drum, they would put it out there.") Even assuming, *arguendo*, that Alberts' statement was admissible, the contamination he describes would not be sudden or accidental, since it involves the intentional placement of leaking drums on the property over a long period of time.  Moreover, to the extent that Plaintiff suggests that contamination, caused by barrels leaking as they were being transported from the building to where they were discarded behind the building, was sudden and accidental, the Court finds that the argument lacks merit.

Finally, Plaintiff suggests that, since the drums may have begun to leak indoors, before being taken outdoors, the leaking cutting fluid should not be considered "pollution," within the meaning of the pollution exclusion.  On this point, Plaintiff cites *Kenyon v. Security Ins. Co. of Hartford*, 163 Misc.2d 991, 626 N.Y.S.2d 347 (Sup. Ct. Monroe County 1993), for the proposition that, "some events which involve release of contaminants indoors do not trigger the pollution exclusion." (Plaintiff's Memo of Law [#241] at 5).  The *Kenyon* decision involved a condominium resident who was injured by carbon monoxide gas from a malfunctioning furnace.  The undersigned, then sitting as a New York State Supreme Court Justice, held that the complained-of carbon monoxide was not a "pollutant" within the meaning of the subject insurance policy.  However, the *Kenyon* decision did not turn on the indoor/outdoor nature of the release, as Plaintiff suggests, but rather, it turned on the nature of the contaminant, the manner of the release, and the expectations of the parties to the insurance contract. *Id*., 163 Misc.2d at 351, 626 N.Y.S.2d at 997-98.  For example, the plaintiff In *Kenyon*, unlike Clark Witbeck, "did not generate or produce hazardous substances routinely in the course of his profession, nor did he dispose of toxic waste as a part of his business." *Id*. Consequently, the *Kenyon* decision is inapposite.  Moreover, even if Plaintiff's legal argument was sound, there is no indication that any of the contamination complained of in this action resulted from an indoor release.  Instead, at most the evidence suggests that the complained-of contamination occurred because Clark Witbeck employees intentionally placed the leaking drums outdoors to leak.

In this case, the parties have been unable to discover any actual insurance

14

policy issued by Hartford to Clark Witbeck.  The parties agree that *Gold Fields Am. Corp. v. Aetna Cas. and Sur. Co.*, 173 Misc. 2d 901, 661 N.Y.S.2d 948 (Sup. Ct. NY County 1997) correctly states the standard for proving the terms of a missing insurance policy.  Specifically, an insured may prove the contents of a missing insurance policy using secondary evidence, and must do so by a preponderance of evidence. *Id.*, 173 Misc.2d at 905, 661 N.Y.S.2d at 951 ("This court finds nothing unfair in holding the plaintiff to the usual preponderance of the evidence standard of persuasion where the carrier, which is in the business of selling policies, chooses to keep no records at all of those policies.").  It is undisputed, however, that if Hartford insured Plaintiff under a commercial general liability policy, such policy or policies would have contained a pollution exclusion.  Consequently, because the Court finds that any coverage by Hartford would be barred by the pollution exclusion, the Court need not consider whether or not Plaintiff has met its burden of proving such coverage.

## CONCLUSION

For the foregoing reasons, Hartford's motion [#195] for summary judgment is granted.

So Ordered.

Dated: Rochester, New York
        November 13, 2007

ENTER:


/s/ Charles J. Siragusa_____
CHARLES J. SIRAGUSA
United States District Judge