UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EMERSON ENTERPRISES, LLC,

                       Plaintiff,          No. 03-CV-6530 CJS

     -vs-

                                          DECISION AND ORDER

KENNETH CROSBY NEW YORK, LLC,
JAYNE C. SUMMERS, CLARK WITBECK,
INC., BRIAN J. CAIN, BARBARA
GOODRICH, as Executor of the Estate
of VERNON GOODRICH, DEAN BRODIE,
CURTIS S. KLING, THE TRAVELERS
INDEMNITY CO., JOHN DOE CORPORATIONS,
JOHN DOES, and JOHN DOE INSURANCE
COMPANIES,

                       Defendants.

_____

APPEARANCES

For Plaintiff:                     Alan J. Knauf, Esq.
                                  Knauf Shaw, LLP
                                  975 Crossroads Building, 2 State Street
                                  Rochester, New York 14614

For Defendant Dean Brodie:          Amy K. Kendall, Esq.
                                  Hiscock & Barclay, LLP
                                  2000 HSBC Plaza
                                  100 Chestnut Street
                                  Rochester, New York 14604

For Defendants Kenneth Crosby
New York, LLC, and Jayne C.
Summers:                    Alexander Geiger, Esq.
                                  Geiger and Rothenberg, LLP
                                  45 Exchange Street, Suite 800
                                  Rochester, New York 14614

1

INTRODUCTION

This is an action pursuant to, *inter alia*, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, the Resource Conservation Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, the New York Environmental Conservation Law ("ECL"), and New York Navigation Law.  Now before the Court are the following motions: 1) a motion for summary judgment [#305] by defendant Dean Brodie ("Brodie"); and 2) a cross-motion to dismiss/for summary judgment [#320] by plaintiff Emerson Enterprises, LLC ("Plaintiff").  For the reasons that follow, Brodie's motion is granted in part and denied in part, and Plaintiff's cross-motion is granted.

BACKGROUND

The history of this action is set forth in numerous prior decisions by this Court (Docket Nos. [#165][#225][#227][#263][#264][#303]).  For purposes of the instant Decision and Order it is sufficient to note the following facts.

This action involves environmental contamination of a parcel of land owned by Plaintiff, known as 640 Trolley Drive ("640 Trolley Drive," "the property," or "the site") in the Town of Gates, New York.  Prior to 1960, the property was vacant land.  In the 1960's, Plaintiff's predecessors constructed a 12,300 square-foot masonry structure on the property.  At all relevant times, Plaintiff has either used or leased the property for commercial purposes.  Defendant Clark Witbeck, Inc. ("Clark Witbeck") leased the property from the early 1960s until 1992. Clark Witbeck used the property to sell industrial tools and supplies, including a cutting oil known as Cimcool, which was manufactured by the Cincinnati Milacron Company ("Cincinnati Milacron").  At all relevant

times, Cimcool contained mineral oil.  Moreover, prior to 1979, Cimcool contained Aroclor 1254, which is a polychlorinated biphenyl (PCB).  Cimcool was packaged in pink, 55-gallon steel drums and five-gallon pails.

From the early 1960's until approximately May 1980, Clark Witbeck was owned by Curtis Kling ("Kling").  In or about May 1980, Brodie and Vernon Goodrich ("Goodrich") purchased Clark Witbeck.  In 1987, Brodie and Goodrich sold Clark Witbeck to Brian Cain ("Cain").  In or about 1992, Cain dissolved Clark Witbeck and sold some of its assets to Defendant Kenneth Crosby New York, LLC ("Crosby"), which essentially continued the same type of business as Clark Witbeck at the site, until approximately 2000.  Throughout the aforementioned periods, Clark Witbeck and Crosby sold Cimcool at the site.

Ron Spinelli ("Spinelli") began working for Clark Witbeck in 1966, when Kling was the owner, and continued to work there until 1992, including the period of Brodie's ownership of the company. (Spinelli Deposition at 17).  At deposition, Spinelli testified that throughout his employment with Clark Witbeck, there was a "pit" or "dry well" in back of the property, which had been constructed in the early 1960s, prior to his employment. *Id*. at 22, 24.  The pit was eight-to-ten-feet away from the northwest door of the building. *Id*. at 31.  Spinelli indicated that over a period of years, Clark Witbeck employees dumped quantities of Cimcool, that was either discontinued or unwanted by customers, into the drywell. *Id*. at 22, 24.  Spinelli, who worked on the northeast side of the building, testified that workers on the northwest side of the building dumped the liquid. *Id*. at 24-27.  However, Spinelli does not recall who actually dumped the fluid:

Q. . . .  Who would put material in the dry well?

A. Actually dump the barrels?

Q. Yes.

A. I knew it was the guys on the other side of the warehouse.  I don't even know who they were.  I mean, I don't remember the names.  I'm not sure. But I know it was – like I say, we divided the building in half and the guys that worked on the tool side are the ones.  Whoever told them to go dump it, which I'm assuming at that time would have been Curt [Kling], they would just go and dump the drums.  But I don't know who they were.  I can't remember.

Q. Okay.  So was it your understanding that was kind of – that was the standard procedure, to – when there was discontinued material, that it would be put in the dry well?

A. Yes.

*Id*. at 24-25.

Regarding the  dates when this dumping allegedly occurred, Spinelli testified as

follows:

Q.  All right. And when did this activity go on?

A. It was in the '60s.

Q. Okay.  And did it stop at some point?

A. I'm going to say it stopped around Dean Brodie's time, when he took over the business.  Now, I don't – I don't remember exactly, you know, when it stopped, I but I know it did stop.

Q. Do you recall why it stopped?

A. I don't remember why it stopped.  I'm assuming he didn't think it was the right thing to do.  And there was always a problem when it got wet back there, because this stuff would come to the top.  It would – actually, the well must have been filled and when it rained a lot [of] it would come to the top, so I think he stopped it.  I think Dean stopped it.  I don't – it might even have stopped a little before even him, but I can't remember when.

4

Q. Would you remember if any of the use of the dry well happened during his tenure, during Dean Brodie's tenure?

A. No, I couldn't say 'yes' or 'no.'  But I don't think so.

Q. Okay.  And do you know if use of that dry well ever resumed at any point?

A. Not that I know of.

\*\*\*

Q. Okay.  So was it your understanding that was kind of – that was the standard operating procedure, to – when there was discontinued material, that it would be put in the dry well?

A. Yes.

MR. PALUMBO: Objection.  I need a time frame[.]

Q. Oh.  During the tenure of Curtis Kling.

A. Yes.

Q. Now, do you recall there ever being any barrels outside behind the building?

A. I think there was a couple barrels back there.  But not – I mean, there wasn't a lot of – they used to take the barrels back in.  And I think they used to bring the barrels to the scrap yard, the empty barrels, because they were steel at the time.

MR. PALUMBO: Excuse me, Mr. Spinelli.  Are we talking about the period when Mr. Kling was operating the business again?

A. Yes.

(Spinelli Dep. at 23-25).  Spinelli further testified:

Q. And do you know if the pit was used in the late '70s?

A. I don't know.  I can't say.  I don't know.

Q. And do you know if it was used in the early '80s?

A. For some reason, I remember when Dean [Brodie] took it over, I remember him saying something about the pit.  He might have asked me

5

those questions, you know, "What was this used for [?]," and I told him.  He said, "Well, that's going"  – I know he said something to the effect of, "That's going to stop."  And that was it.

***

Q. You testified earlier that Mr. Brodie said words or substance after he took over the business that the use of the pit was to stop?

A.  Yeah, I think that's what he had said, to that effect.

*Id*. at 33-34, 45.

During the period from 1980 to 1987 when Brodie and Goodrich owned Clark Witbeck,  Brodie was president of the corporation, and "r[a]n the operations overall." (Spinelli Dep. at 13).  At his deposition, Brodie stated, "I was responsible, well, for everything.  Sales, marketing, operations, personnel." (Brodie Dep. at 13).  Goodrich, on the other hand, was an accountant and oversaw the corporations Accounting Department. (Spinelli Dep. at 13).  On one occasion during this seven-year period, the date of which is unknown, Brodie was examining the area of the property behind the building, because Clark Witbeck was considering building a parking lot.  Brodie Deposition at 48, 76.  The area was overgrown with "weeds and brush," making it difficult to open the door to the outside. Brodie Deposition at 48.  At that time, Brodie observed a structure near the northwest rear door of the building, which he described as, "somewhat like a large child's sand box, four boards on either side with rock inside the board structure." (Brodie Deposition at 48, 50).  Apparently, this structure was the dry well described by Spinelli.  Brodie indicates that he never discussed the structure with anyone. *Id*. at 50-51, 54.  However, as discussed above, Spinelli states that Brodie "may have" discussed the "pit" with him at some unknown time.

6

Monty Alberts ("Alberts") worked for Clark Witbeck between approximately 1980[1] and 1992.  Alberts testified that approximately one-to-two years after he began working for Clark Witbeck, an official from the Town of Gates notified Clark Witbeck that there were barrels on the land behind the warehouse that had to be removed.  (Alberts Deposition at 23-29, 65).  Alberts helped remove a number of empty barrels from an overgrown area behind the warehouse. *Id*.  Alberts states that, after the barrels were found behind the building, Brodie told him that such dumping of barrels should not occur in the future:

> Q.  . . .  Do you recall the content of that discussion [with Brodie] at all?
>
> A.  *No*.  It was that they [the barrels] were there and that we had to get them  out of there.  And that *if* that was being dumped out there, it was no longer going to ever happen.

Alberts Dep. at 74 (emphasis added).[2]

As for the dry well, Alberts indicated that someone at Clark Witbeck told him that, at some point in time, that employees would dispose of leaking drums in an area called the pit: "And it was kind of brought to our attention that *at a time* they called the area 'the pit.'  And if they had a leaking drum, they would put it out there." *Id*. at 24 (emphasis added); *see also, id*. at 30 ("[I]t came to my knowledge that at one time if they had what they called a leaker, they would dispose of it by pushing it out the back door.  That's how the drums got there."); *id*. at 103 ("I believe the practice was if they had a leaker, it was to put [it] out in the rear.  But I can't tell you for certain.").  However, Alberts never

---

[1] The record indicates that Brodie and Goodrich purchased Clark Witbeck in May 1980.  Alberts testified that he was hired by Brodie "six months to a year" later. (Alberts Dep. at 56-57).

[2] This conversation concerned the discarded barrels.  Alberts does not indicate that he ever had any discussion with Brodie regarding the dry well.

personally saw "the pit." *Id*. at 26.  Alberts further testified that, to his knowledge, Clark

Witbeck stopped using the pit prior to 1980:

> Q. And did anyone give you any information as to when this pit was used?
>
> A. I can only tell you that it was prior to me being there.
>
> ***
>
> [Q.] Mr. Alberts, when you say prior to you being there, do you mean prior
> to the start of your employment in approximately 1980?
>
> [A.] Correct.

*Id*. at 32.  Consequently, Alberts was not aware of any dumping during his employment

with Clark Witbeck.

John Hale ("Hale") worked for Clark Witbeck in the stockroom from approximately

1980 to 1988, which would encompass Brodie's ownership of the company. Hale Dep. at

6, 9.  Hale stated that some years after he began working at Clark Witbeck, Alberts told

him to remove approximately "half a dozen" old barrels that were littering the property

behind the warehouse. *Id*. at 10, 29.  Apparently, these were the same discarded barrels

that Alberts described above.  According to Hale, the barrels "were all rusted.  There was

no way to tell what color.[3]  They had been there for many years." *Id*. at 12; *see also id*. at

38 ("[T]hey were just rotted so bad, not crushed, they were just dented in, not in barrel

shape any longer.").  Hale is not aware of any dumping occurring during his employment

with Clark Witbeck. *Id*. at 31, 34.

In or about 1987, Plaintiff re-graded the property, which resulted in the dry well

being covered with soil. (Kohrn Deposition at 99-100).  There is no indication that Plaintiff

was aware of the dry well's existence when it re-graded the property.  After Crosby

---

[3] Alberts, though, maintains that the barrels were pink in color. Alberts Dep. at 23, 27.

vacated the site in 2000, Plaintiff leased the property to a new tenant.  On or about

October 27, 2000, the new tenant inadvertently uncovered the buried dry well,  while

using a bulldozer to clear land behind the building in preparation for constructing a

parking lot.  The dry well contained dark, foul-smelling liquid.  Upon being notified of the

contamination, the New York Department of Environmental Conservation ("NYDEC")

listed the property on the state's Registry of Inactive Hazardous Waste Disposal Sites.

By letter dated August 28, 2001, the NYDEC informed Plaintiff of its intention to

investigate and possibly seek clean-up costs at the site.  The NYDEC subsequently

arranged for the removal of the dry well in January 2002.  The NYDEC has demanded

that Plaintiff pay for the investigation and remediation at the property.

In March 2002, the NYDEC issued a "Preliminary Site Assessment Report" for the

property. (Plaintiff's Statement of Facts, Exhibit L).  The report "confirmed disposal of

PCBs, 1,1,1-TCA [trichloroethane], and acetone in the drywell located immediately north

of the northwest rear door of the 640 Trolley Boulevard building." *Id*. at 4-1.).  The report

described the drywell as "a four-by-four disposal pit that was staked and lined with cinder

blocks and/or stone." *Id*. at 1-3.  Additionally, the report described the drywell as "a soil

pit approximately 3.5 feet deep, filled with debris consisting of concrete pieces, round

concrete blocks, and metal rods." *Id*. at 2-7.

As for remediation, the DEC determined that it was necessary to remove soil from

two locations on the property, north of the building: (1) "the area [of] the former

drywell/disposal pit;" and (2) "the area where regrading occurred and soil was historically

stockpiled during past parking lot expansion activities." (Plaintiff's Cross Motion, Ciufo

Affidavit, Exhibit C, DEC "Record of Decision" dated March 2009, at ii).

9

Plaintiff commenced the subject action on October 29, 2003.  The Second Amended Complaint [#100] purports to allege the following thirteen claims against Brodie: 1) strict liability for cleanup costs pursuant to CERCLA, 42 U.S.C. § 9607(a); 2) liability for remedy and abatement pursuant to RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B); 3) strict liability for damages under ECL Article 37; 4) negligence; 5) strict liability for cleanup costs; 6) public nuisance; 7) waste; 8) equitable or implied indemnification; 9) restitution; 10) trespass; 11) private nuisance; 12) strict liability under the Navigation Law § 181(5); and 13) contribution under the Navigation Law Article 12, including § 176(8).  Plaintiff also asserted various claims against Crosby and several other defendants associated with Crosby ("the Crosby Defendants").

The Crosby Defendants answered [#127] the Second Amended Complaint and asserted the following counterclaims: 1) contribution under CERCLA; 2) negligence; 3) common law contribution and indemnification; 4) declaratory judgment that Plaintiff and the Clark Witbeck Defendants, including Brodie, are solely liable under CERCLA, RCRA, and the Navigation Law ; and 5) indemnification under ¶ 37(C) of Crosby's lease with Plaintiff. (Answer to Second Amended Complaint with Counterclaims [#101]).  The Crosby Defendants also asserted the following cross-claims against the Clark Witbeck Defendants, including Brodie: 1) a claim for contribution under CERCLA; 2) a common-law claim for contribution and indemnification based on negligence; 3) a common-law claim for contribution and indemnification based on strict liability; 4) a claim for a declaratory judgment concerning liability under CERCLA, RCRA, and the Navigation Law; and 5) a claim for contribution and indemnification for any damages and costs other than those covered by CERCLA.

10

Brodie answered Plaintiff's Second Amended Complaint, and asserted, *inter alia*, counterclaims against Plaintiff for contribution under CERCLA and the Navigation Law, and for a declaratory judgment that Plaintiff is liable for the alleged contamination under CERCLA and the Navigation Law.   Brodie subsequently filed the subject motion [#305] for summary judgment on all of Plaintiff's claims.  Brodie also requests costs and attorney's fees from Plaintiff and the Crosby Defendants, pursuant to RCRA § 7002(e). In that regard, Brodie maintains that Plaintiff and the Crosby Defendants have each asserted claims against him under RCRA, and that he is entitled to costs and attorney's fees if he prevails on the RCRA claims.  Plaintiff opposes Brodie's motion, and cross-moves [#320] to dismiss Brodie's counterclaims.

ANALYSIS

*Summary Judgment Standard*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of*

11

*Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc*., 369 U.S. 654, 655 (1962).

It is clear that a party cannot rely on speculation to defeat a summary judgment motion:

> In order to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence that sets forth specific facts showing a genuinely disputed factual issue that is material under the applicable legal principles.  A party opposing summary judgment does not

show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory, or based on speculation[.]

*Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008)

(citations and internal quotation marks omitted).

CERCLA

Plaintiff's first claim against Brodie is pursuant to CERCLA, and the applicable

legal principles for such a claim are clear:

> In order to establish liability under CERCLA, a plaintiff must make a prima facie showing that includes evidence that the defendant is a responsible party. *See ABB Indus. Sys., Inc. v. Prime Technology, Inc.*, 120 F.3d 351, 356 (2d Cir.1997). CERCLA imposes liability on four classes of persons, including "any person who *at the time of disposal* of any hazardous substance[4] owned  or operated any facility at which such hazardous substances were disposed of [.]" 42 U.S.C. § 9607(a)(2) (emphasis added). "Disposal" in turn "means the discharge, deposit, injection, dumping, spilling, leaking, or placing" of contaminants into the surrounding environment. 42 U.S.C. § 6903(3) (emphasis added); 42 U.S.C. § 9601(29) (adopting definition of "disposal," for the purposes of CERCLA, from 42 U.S.C. § 6903(3))

*Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 178 (2d Cir. 2003)

(emphasis added).  Disposal does not include "the gradual spreading of hazardous

chemicals already in the ground," and therefore, "prior owners and operators of a site are

not liable under CERCLA for mere passive migration." *ABB Indus. Systems, Inc. v. Prime*

*Tech., Inc.*, 120 F.3d 351, 358-359 (2d Cir. 1997) (citation omitted).

Plaintiff maintains that Brodie is liable as a facility owner or operator pursuant to

CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2).  As discussed above, though, and as

---

[4]"Hazardous substances" under CERCLA are listed at 40 C.F.R. § 302.4, and include PCBs, 1,1,1-TCA [trichloroethane] and acetone.  However, "[p]etroleum and petroleum products are explicitly excluded from the definition of hazardous substances under CERCLA." *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, Master File No. 1:00-1898, MDL No. 1358(SAS), No. M21-88, 2008 WL 2676278 at *3 (S.D.N.Y. Jul. 8, 2008) (citing 42 U.S.C. § 9601(14)).

Plaintiff's memorandum of law reiterates,[5] to be liable under that section, a person must be an owner or operator "at the time of disposal" of a hazardous substance.  Plaintiff has not produced any evidentiary proof in admissible form that the identified hazardous substances were disposed of, within the meaning of CERCLA, during the period that Brodie owned or operated Clark Witbeck.  The deposition testimony, including that of Spinelli and Alberts, and other evidence of record, does not create such an inference.  Instead, the record creates the reasonable inference that the dumping of contaminants had stopped by the time that Brodie purchased Clark Witbeck.  Brodie's alleged statement upon learning of the existence of the pit, that *if* such dumping had occurred or was occurring it should never happen again, does not indicate that any dumping was occurring.  Nor is there any other evidence that dumping was occurring at any time during Brodie's ownership of Clark Witbeck.  Consequently, Brodie is entitled to summary judgment on the CERCLA claim.

RCRA

Plaintiff also brings a claim under RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), which provides, in relevant part, that

any person may commence a civil action on his own behalf--

(B) against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]

42 U.S.C. § 6972(a)(1)(B).  Courts in this Circuit have held that petroleum is a "solid or

---

[5]Plaintiff's Memo of Law at  3.

14

hazardous waste." *See, e.g., U.S. v. Hill*, No. 95-CV-1716 (RSP/GJD),1998 WL 278291 at *3 (N.D.N.Y. May 20, 1998) ("[L]eakage of gasoline from an underground storage tank into the surrounding soil constitutes disposal of a solid waste under RCRA.") (citations omitted).

It is clear that "[r]emediation costs are not available in a RCRA action; a court only may order a mandatory or prohibitory injunction relating to cleanup efforts." *Kaladish v. Uniroyal Holding, Inc.*, No. Civ.A. 300CV854CFD, 2005 WL 2001174 at *5 (D.Conn. Aug. 9, 2005) (*citing Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484, 116 S.Ct. 1251, 1254 (1996) ("It is apparent from the two remedies described in § 6972(a) that RCRA's citizen suit provision is not directed at providing compensation for past cleanup efforts. Under a plain reading of this remedial scheme, a private citizen suing under § 6972(a)(1)(B) could seek a mandatory injunction, i.e., one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, i.e., one that 'restrains' a responsible party from further violating RCRA.")).  In that regard, Plaintiff here is seeking a judgment directing Defendants "to remediate the contamination, abate this imminent and substantial endangerment, and pay Plaintiff's litigation costs." (Second Amended Complaint [#100] ¶ 112).

Plaintiff maintains that Brodie is liable under RCRA § 7002(a)(1)(B), because he was involved in the "disposal" of waste.  On this point, Plaintiff states that, "[t]here is an issue of fact as to whether materials were dumped in the Pit during Brodie's tenure." Pl. Memo of Law at 16.  However, for the reasons already discussed, the Court disagrees and finds that there is no such issue of fact.  Alternatively, Plaintiff contends that Brodie

is liable since he "stored" hazardous waste in the dry well, by allowing it to remain there. Pl. Memo of Law at 16 ("Brodie knew that his operation was storing dumped chemicals in the Pit, but he did nothing about it."). Again, however, the Court disagrees. First, as the Court has discussed in at least one prior Decision and Order in this case, a dry well is the exact opposite of a storage device, since it is designed to disperse liquid into the ground.[6] Moreover, even assuming *arguendo* that the pit could be considered a storage device, there is no indication that Brodie was aware of any hazardous waste in the pit. *See*, Brodie Dep. at 53 (Brodie testified that when he saw the pit it contained rocks and no fluid). Accordingly, the Court finds that Brodie is entitled to summary judgment on the RCRA claim.

BRODIE'S CLAIM FOR COSTS AND ATTORNEY'S FEES UNDER
RCRA § 7002(e)

Because the Court is granting summary judgment to Brodie on the RCRA claim, he contends that he is entitled to costs and attorneys fees from Plaintiff and the Crosby Defendants. In that regard, he maintains that the RCRA claims against him are "baseless," since there is "overwhelming evidence that [he] has no personal liability for any contamination at the site." Brodie Memo of Law at 24. The relevant RCRA provision states, in pertinent part:

> Costs. The court, in issuing any final order in any action brought pursuant
> to this section . . . may award costs of litigation (including reasonable
> attorney and expert witness fees) to the prevailing or substantially
> prevailing party, whenever the court determines such an award is
> appropriate.

---

[6] At his deposition, Plaintiff's owner stated that the "dry well was a mechanism for disposing of contaminants. . . . It was a place to dispose of contaminants." Ciufo Dep. at 92.

16

42 U.S.C.A. § 6972(e) (West 2011).  For a defendant to qualify as a prevailing party, it "must show that the plaintiffs' claim was frivolous, unreasonable, or groundless, or that the plaintiff[ ] continued to litigate after it clearly became so," and the court's decision is reviewed for abuse of discretion. *George v. Reisdorf Bros., Inc.*, Nos. 10-0798-cv (L), 10-1208-cv (XAP), 2011 WL 326511 at *4 (2d Cir. Feb. 3, 2011) (citation and internal quotation marks omitted).  Here, the Court declines to award costs and attorney's fees to Brodie, since the RCRA claims against him appear to have been asserted in good faith. Although Plaintiff was unsuccessful on its RCRA claim, the claim had an arguable basis in fact. *See, id*. (Denying the defendant's motion for attorney's fees and costs, noting that the "[plaintiff's] claims of pollutant discharges had some arguable basis in fact and indeed had spurred previous complaints on the plaintiffs' part to the state environmental agencies. Under these circumstances, the district court's decision not to award fees to [the defendant] was not an abuse of discretion.") (citation omitted).  As for the Crosby Defendants, the Court agrees with them that their cross-claim against Brodie does not qualify him to receive costs and attorney's fees, since the cross-claim merely sought a declaratory judgment that they are not liable under RCRA.  That is, the Crosby Defendants did not assert a claim against Brodie under 42 U.S.C. § 6972.  Moreover, even assuming that the Crosby Defendants' cross-claim qualified as a claim under 42 U.S.C. § 6972, the Court would still deny Brodie's application, since the claim appears to have had a basis in fact, and to have been asserted in good faith.

ECL ART. 37

Article 37 of the ECL, § 37-0107, states: "No person shall store or release to the environment substances hazardous or acutely hazardous to public health, safety or the

environment in contravention of rules and regulations promulgated pursuant hereto."
The list of hazardous substances covered by ECL Art. 37 includes PCBs, 1,1,1-TCA
[trichloroethane], acetone, and petroleum. 6 NYCRR § 597.1(a)(3) (vi) & (ix).  However,
as this Court has previously found, there is no private right of action under ECL § 37-
0107 to recover damages. *See, Kalden Const. Co., Inc. v. Hanson Aggregates New
York, Inc.*, 634 F.Supp.2d 319, 322 (W.D.N.Y. 2009) ("[T]he weight of authority in New
York is that the ECL does not provide a private right of action."); *see also, Geysir Sales
Corp., Inc. v. Arctic Glacier, Inc.*, 78 A.D.3d 653, 653, 909 N.Y.S.2d 668, 669, 2010 N.Y.
Slip Op. 07892 (2d Dept. 2010) ("The ECL did not create a private cause of action to
recover damages for violations of this provision," referring to ECL § 37-0107) (citations
omitted); *but see, DiBuono v. Abbey, LLC*, 69 A.D.3d 670, 891 N.Y.S.2d 656 (2d Dept.
2010) (denying a motion to dismiss a claim for damages under ECL § 37-0107).
Consequently, the Court finds that Plaintiff cannot maintain this cause of action.  Even
assuming *arguendo* that Plaintiff could sue for money damages under ECL § 37-0107,
there is no evidence that Brodie stored or released hazardous substances.  Therefore
Brodie is entitled to summary judgment on Plaintiff's claim under ECL § 37-0107.

NAVIGATION LAW

Navigation Law § 173(1) provides that "[t]he discharge of petroleum is prohibited."
The Navigation Law further provides that "[a]ny person who has discharged petroleum
shall be strictly liable, without regard to fault, for all cleanup and removal costs and all
direct and indirect damages, no matter by whom sustained, as defined in this section." *Id*.
§ 181(1).  Under the Navigation Law, the term discharge means, in relevant part, "any

18

intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of petroleum into the waters of the state or onto lands from which it might flow or drain into said waters." Navigation Law § 172(8).

The Navigation Law is to be construed liberally. *See*, Navigation Law § 195 ("This article, being necessary for the general health, safety, and welfare of the people of this state, shall be liberally construed to effect its purposes.").  The purpose of the statute is "to ensure prompt and effective cleanup of environmental pollutants," and any interpretation of it that would encourage a party to "neglect the environmental hazard" would be contrary to the legislature's intentions. *See, White v. Long*, 85 N.Y.2d 564, 569, 650 N.E.2d 836, 838 (1995).  Consequently, New York Courts have held that a discharger "includes a party who is in a position to halt a discharge, to effect an immediate cleanup or to prevent the discharge in the first place." *State v. Avery-Hall Corp.*, 279 A.D.2d 199, 201, 719 N.Y.S.2d 735, 736 (3d Dept. 2001) (citation and internal quotation marks omitted); *see also, State v. Montayne*, 199 A.D.2d 674, 604 N.Y.S.2d 978, 979 (3d Dept. 1993) ("In accordance with Navigation Law § 195, we have liberally construed these provisions to impose liability upon firefighters who allegedly damaged an above-ground petroleum storage tank while fighting a fire, owners of the system from which the discharge occurred, the deliverer of oil and the repairer of the oil tank, and the owner of an oil truck involved in a motor vehicle accident.  The rationale for finding that these persons were within the purview of the statute was that they were in a position to halt the discharge, to effect an immediate cleanup or to prevent the discharge in the first

19

place.") (citations omitted).

Plaintiff has sued Brodie under Navigation Law § 181(5), which states:

Any claim by any injured person for the costs of cleanup and removal and direct and indirect damages based on the strict liability imposed by this section may be brought directly against the person who has discharged the petroleum, provided, however, that damages recoverable by any injured person in such a direct claim based on the strict liability imposed by this section shall be limited to the damages authorized by this section.

MCKINNEY'S NAVIGATION LAW § 181(5) (2011). "[A] defendant will only be held liable to plaintiff for clean-up costs and damages under Navigation Law § 181(5) if it is proven that he is a person who actually caused or contributed to the discharge." *White v. Long*, 229 A.D.2d 178, 181, 655 N.Y.S.2d 176, 178 (3d Dept. 1997) (citation omitted). Corporate officers may be held personally liable under the Navigation Law if they were "directly, actively and knowingly involved in the culpable activities or inaction which led to a spill." *Golovach v. Bellmont L.M., Inc.*, 4 A.D.3d 730, 773 N.Y.S.2d 139 (3d Dept. 2004) ("This Court has previously held that in order to hold a corporate stockholder, officer or employee personally liable under the Navigation Law for a discharge occurring at a site owned or operated by the corporation, that individual must, at a minimum, have been directly, actively and knowingly involved in the culpable activities or inaction which led to a spill.") (citation and internal quotation marks omitted); *see also, State v. Markowitz*, 273 A.D.2d 637, 642, 710 N.Y.S.2d 407, 412 (3d Dept. 2000) ("[W]e hold that in order to hold a corporate stockholder, officer or employee personally liable under the Navigation Law for a discharge occurring at a site owned or operated by the corporation, that individual must, at a minimum, have been directly, actively and knowingly involved in the culpable activities or inaction which led to a spill or which allowed a spill to continue unabated.")

(citations omitted).

Plaintiff contends that there is an issue of fact on this claim precluding Brodie's

motion for summary judgment.  Specifically, Plaintiff states:

> Brodie was made aware during his tenure as President of Clark Witbeck
> that dumping was occurring on the property, both through word of mouth
> regarding the dry well, his own personal observation of the dry well and the
> removal of 5-6 abandoned barrels from the rear of the property.  Armed
> with this knowledge of disposal, however, Brodie failed to undertake any
> actions to report the situation to the property authorities [sic], or to
> undertake any investigation and/or remediation.

Pl. Memo of Law at 18.  At the outset, though, the Court disagrees with Plaintiff's

contention that Brodie was aware that "dumping *was occurring* on the property."  As

already discussed, there is no evidence that dumping was occurring during Brodie's

ownership of Clark Witbeck.  At most, the record indicates that Brodie was made aware

that dumping by Clark Witbeck employees *had occurred* in the past.  Moreover, as

discussed above, there is no indication that Brodie was aware of any pollutant remaining

in the dry well.  Instead, when Brodie saw the dry well, it was essentially a dry hole in the

ground containing rocks.

Nevertheless, the Court agrees with Plaintiff that Brodie is potentially liable under

Navigation Law § 181(5) for having "caused or contributed to the discharge," by failing to

report past suspected dumping, or by failing to take some kind of remedial action to

prevent the spread of contamination.  The Court also agrees with Plaintiff that there are

triable issues of fact precluding summary judgment on this claim.  Accordingly, Brodie's

motion for summary judgment under Navigation Law § 181(5) is denied.

Plaintiff also alleges a claim against Brodie under Navigation Law § 176(8), which

states, in pertinent part, that "every person providing cleanup, removal of discharge of

petroleum or relocation of persons pursuant to this section shall be entitled to contribution from any other responsible party." McKinney's Navigation Law § 176(8) (2011).  In his summary judgment motion, Brodie contends that this claim is "irrelevant," since "Plaintiff has not cleaned or removed petroleum or any other hazardous waste from the site.  The removal and remediation are being conducted by NYDEC." Brodie Memo of Law at 22, n. 44.  Plaintiff concedes this point by failing to provide any argument or evidence to the contrary.  Consequently, Brodie is entitled to summary judgment on the claim under Navigation Law § 176(8).

BRODIE'S ALLEGED PERSONAL INVOLVEMENT IN THE REMAINING COMMON- LAW TORTS

Plaintiff alleges the following common-law torts against Brodie: negligence; strict liability for cleanup costs; public nuisance; waste; equitable or implied indemnification; restitution; trespass; and private nuisance.   It is well-settled under New York law that,

> [a] corporate officer is not held liable for the negligence of the corporation merely because of his official relationship to it. It must be shown that the officer was a participant in the wrongful conduct.  If a director or officer commits, or participates in the commission of, a tort, whether or not it is also by or for the corporation, he is liable to third persons injured thereby.

*Aguirre v. Paul* , 54 A.D.3d 302, 304, 862 N.Y.S.2d 580, 582 (2d Dept. 2008) (citations and internal quotation marks omitted).  In the instant case, Plaintiff maintains that Brodie was personally involved[7] in the aforementioned torts, "due to his failure to prevent or properly respond to the contamination." Pl. Memo of Law at 10.  Again, however, there is no evidentiary proof in admissible form that Brodie failed to "prevent" contamination, since there is no indication that dumping occurred during his ownership of Clark Witbeck.

---

[7]Plaintiff does not seek to pierce Clark Witbeck's corporate veil.

Consequently, any liability against Brodie for the aforementioned torts must be based on his alleged failure to "properly respond to the contamination" created prior to his ownership of Clark Witbeck.  On this point, there is evidence that Brodie learned of rumors concerning past dumping by Clark Witbeck employees, and it is undisputed that he did not report that information to the authorities or take any kind of remedial action.[8] The Court will now consider the various common-law torts.

TRESPASS

"[A] trespass is an intentional physical entry onto the property of another without justification or permission." *Corsello v. Verizon New York, Inc.*, 77 A.D.3d 344, 357, 908 N.Y.S.2d 57, 69 (2d Dept. 2010).  Under the law of New York State, a party may be liable for trespass for allowing noxious liquids to move from one property to another:

> There is a body of law on trespass claims arising from the movement of noxious liquids from one property to another. The New York Court of Appeals has held that:
>
>> even when the polluting material has been deliberately put onto, or into, defendant's land, he is not liable for his neighbor's damage therefrom, unless he (defendant) had good reason to know or expect that subterranean and other conditions were such that there would be passage from defendant's to plaintiff's land.

*Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996) (citation omitted).  Plaintiff alleges that Brodie committed trespass by failing to take remedial action, thereby allowing contamination to move from the subject property onto "adjacent properties" owned by

---

[8]Brodie appears to concede that he was so informed. *See*, Brodie's Reply Memo at 3-4 ("When Mr. Brodie was made aware of the rumor of improper disposal practices which may have occurred during the 1960s and 1970s, he made it clear that such a practice, if it ever happened, was not to occur during his tenure as president.").

Plaintiff. See, Amended Complaint ¶ ¶ 148-151." In that regard, the Second Amended Complaint states that, "Plaintiff also owns adjacent properties ('the Adjacent Properties'), including the property at 630 Trolley Drive[.]" *Id*. at ¶ 61. However, in the instant case, there is no evidentiary proof in admissible form of a trespass of pollution from 640 Trolley Drive onto adjacent property owned by Plaintiff. *See*, Kohrn Deposition [#293-10] at 87 ("It doesn't seem likely that the contamination at 640 is related to anything that happened at 630."); *see also, id*. at 239 ("630 Trolley Boulevard is just to the east of 640 Trolley Boulevard, and the sample results for the PCBs decreased going toward the building. So essentially near 630 Trolley, the sample results were non-detect for PCBs."). Consequently, Brodie is entitled to summary judgment on the trespass claim.

PRIVATE NUISANCE

To establish a claim for private nuisance, a plaintiff must show "an interference (1) substantial in nature, (2) intentional in origin, (3) unreasonable in character, (4) with a person's property right to use and enjoy land, (5) caused by another's conduct in acting or failure to act." *Aristides v. Foster*, 73 A.D.3d 1105, 1106, 901 N.Y.S.2d 688, 689 (2d Dept. 2010) (citations omitted). However, a plaintiff may not maintain a claim for nuisance where the "injury complained of was to the same property on which the nuisance was alleged to exist." *Rose v. Grumman Aerospace Corp.*, 196 A.D.2d 861, 862, 602 N.Y.S.2d 34 (2d Dept. 1993) (citation omitted). Here, Plaintiff alleges that Brodie "caused an unreasonable and substantial interference with Plaintiff's right to use and enjoy the Adjacent Properties." Second Amended Complaint ¶ 153. Again, though, the record only establishes contamination of 640 Trolley Drive, which is the same

24

property where the alleged nuisance existed.  As discussed above, there is no evidentiary proof in admissible form in the record of any damage to adjacent property owned by Plaintiff.  Accordingly, Brodie is entitled to summary judgment on the private nuisance claim.

THE REMAINING TORT CLAIMS

Plaintiff additionally asserts claims against Brodie for negligence, strict liability, public nuisance,[9] waste,[10] equitable or implied indemnification,[11] and restitution.  In his

---

[9] "In New York, public nuisance is defined as 'conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a matter such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a  considerable number of persons.'" *City of New York v. Milhelm Attea & Bros., Inc.*, 550 F.Supp.2d 332, 349-350 (E.D.N.Y. 2008) (*quoting Copart Indus. Inc., v. Consolidated Edison Co. of New York, Inc.*, 41 N.Y.2d at 568, 394 N.Y.S.2d at 172).  "[T]he release or threat of release of hazardous waste into the environment unreasonably infringes upon a public right and thus is a public nuisance as a matter of New York law." *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1051 (2d Cir. 1985).  "Every individual and entity is responsible to the State and the general population not to cause or contribute to a public nuisance and may be required to take ameliorative actions to diminish his, her, or its contribution to the nuisance, regardless of whether the creation of the nuisance was foreseeable or whether defendant's conduct in creating or contributing to the nuisance was wrongful." *People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*, 309 A.D.2d 91, 113, 761 N.Y.S.2d 192, 209 (1st Dept. 2003) (citations omitted).  A plaintiff cannot maintain an action for public nuisance based on the "defendant's alleged interference with [the] plaintiff['s] rights as remainderm[a]n of the property leased to defendant," however, such plaintiff may nevertheless maintain a cause of action for public nuisance based on his status as a member of the public and the defendant's alleged violation of "interests and rights common to all." *Drouin v. Ridge Lumber, Inc.*, 209 A.D.2d 957, 959, 619 N.Y.S.2d 433, 435 (4th Dept. 1994) (citations omitted).

[10] "[A]ctions in waste are generally relegated to cases where the holder of real property causes a deterioration of the property, impairment of a mortgage, or a loss of assets or value of a corporation by its fiduciaries." *Rehman v. State Univ. Of New York at Sony Brook*, 596 F.Supp.2d 643, 660 (E.D.N.Y. 2009); *see also, Sutton Investing Corp. v. City of Syracuse*, 48 A.D.3d 1141, 1142, 853 N.Y.S.2d 233, 234 (4th Dept. 2008) ("[W]aste to property has been defined as any destruction, misuse, alteration, or neglect of premises by one lawfully in possession thereof to the prejudice of the interest therein of another.") (citation and internal quotation marks omitted).

[11] "Implied indemnification is based in simple fairness and seeks to avoid unjust enrichment by recognizing that a person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity.  Stated another way, one is entitled to implied indemnification where he or she has committed no wrong but is held vicariously liable for the wrongdoing of another." *Westbank Contracting, Inc. v. Rondout Valley Cent. School Dist.*, 46 A.D.3d 1187, 1189, 847 N.Y.S.2d 780, 782 (3rd Dept. 2007) (citations and internal quotation marks omitted); *see also, Germantown Cent. Sch. Dist. v. Clark, Clark, Millis & Gilson, AIA*, 294 A.D.2d 93, 99, 743 N.Y.S.2d 599, 604, n. 2 (3rd Dept. 2002) ("A cause of action for implied indemnification

memorandum of law in support of his summary judgment motion, Brodie states that,

"Plaintiff has not and cannot prove with respect to Mr. Brodie the elements of any of the

torts alleged in the Complaint," but does not set forth or discuss the elements of any of

those causes of action. Brodie Memo of Law at 14.  Brodie also conclusorily states that,

"Plaintiff has not produced any evidence, as none exists, that Mr. Brodie himself

personally committed negligence, . . . nuisance (public or private), or any of the other

torts alleged in the Complaint." *Id*. at 15.  However, as already discussed, there is

evidence that Brodie learned of past dumping by Clark Witbeck, and failed to make any

further inquiry or take any type of remedial action to prevent the spread of contamination.

Having considered the parties' submissions and the entire record, the Court finds that

Brodie has not demonstrated that he is entitled to judgment as a matter of law on the

remaining tort claims.  Additionally, there are issues of fact concerning what Brodie may

have known about past contamination by Clark Witbeck employees.  Consequently,

Brodie's motion for summary judgment is denied as to the claims for negligence, strict

liability, public nuisance, waste, equitable or implied indemnification, and restitution.

PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON
BRODIE'S COUNTERCLAIMS

Plaintiff contends that Brodie cannot produce evidence to support his

counterclaims. *See*, Pl. Memo of Law at 25 ("While Brodie has lodge[d] counterclaims,

he has failed to show now Plaintiff is liable or [how he] sustained damages.").  In

response, Brodie has not come forward with evidentiary proof in admissible form to

---

requires a showing that plaintiff and defendants owed a duty to third parties, and that plaintiff discharged
the duty which, as between plaintiff and defendants, should have been discharged by defendants.").

support his counterclaims against Plaintiff.  Instead, Brodie merely states:  "In response to Plaintiff's motion cross-claim, [sic] in the event that Mr. Brodie's summary judgment motion is granted, Mr. Brodie will agree to dismiss his claims against the other parties, except for his claims [for costs and attorney's fees under RCRA]." Brodie Reply Memo at 2.  Consequently, Plaintiff is granted summary judgment on Brodie's counterclaims.

CONCLUSION

Brodie's summary judgment motion [#305] is granted in part and denied in part, as follows:  Brodie is granted summary judgment on the claims under CERCLA, RCRA, ECL Article 37, and Navigation Law § 176(8), as well as on the claims for trespass and private nuisance; otherwise, Brodie's application is denied, including his request for costs and attorney's fees under RCRA.  Plaintiff's cross-motion [#320] for summary judgment on Brodie's counterclaims is granted.

So Ordered.

Dated: Rochester, New York          ENTER:
          March 14, 2011


                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge